1  DAVID F. MCDOWELL (CA SBN 125806)
   DMcDowell@mofo.com
2  PURVI G. PATEL (CA SBN 270702)
   PPatel@mofo.com
3  MORRISON & FOERSTER LLP
   555 West Fifth Street, Suite 3500
4  Los Angeles, California  90013-1024
   Telephone:  (213) 892-5200
5  Facsimile:   (213) 892-5454

6  Attorneys for Defendant
   HARTFORD CASUALTY INSURANCE COMPANY
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  PYRAMID TECHNOLOGIES, INC.,              Case No.  SACV08-00367 AHS
                                             (RNBx)
12              Plaintiff,
                                             **MEMORANDUM OF POINTS**
13       v.                                  **AND AUTHORITIES IN**
                                             **SUPPORT OF DEFENDANT**
14  HARTFORD CASUALTY INSURANCE              **HARTFORD CASUALTY**
    COMPANY, an Indiana corporation; and     **INSURANCE COMPANY'S**
15  DOES 1 through 50, inclusive,            **MOTION FOR SUMMARY**
                                             **JUDGMENT**
16              Defendants.
                                             Date:    May 9, 2011
17                                           Time:    10:00 a.m.

18                                           The Honorable Alicemarie H. Stotler

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...................................................................................1

II.    UNCONTROVERTED FACTS..............................................................2

    A.     The Parties, Insurance Policy, and Background to the Case................2

    B.     No Water From the August 2005 Water Intrusion Came Into
           Contact With Any Inventory at Issue and Hartford's Expert
           Concluded That There Was No Damage to Pyramid's Inventory .......3

    C.     Pyramid Did Not Test the "Moisture-Sensitive" Items in Its
           Inventory and Failed to Follow Manufacturer Standards for
           Such Items .........................................................................................4

    D.     Pyramid's Claims for Inventory Total Loss, Business
           Interruption, and Building Restoration .................................................5

        1.     Pyramid made an Inventory Loss claim without evidence
              of any damage to its inventory...........................................5

        2.     Pyramid made a Business Interruption claim without
              evidence of any loss of business caused by the water
              intrusion ...........................................................................8

        3.     Following Hartford's full payment of Pyramid's
              substantiated Building Restoration claim, Pyramid made
              two unsubstantiated claims that Hartford denied......................9

III.   LEGAL STANDARD .............................................................................10

IV.    ARGUMENT...........................................................................................11

    A.     Hartford Is Entitled to Summary Judgment on Pyramid's Breach
           of Contract Claim ...............................................................................11

        1.     Pyramid's Inventory Loss claim fails as a matter of law
              because Pyramid cannot show any damage to its
              inventory resulting from the water intrusion ...........................12

        2.     Pyramid's Business Interruption claim fails as a matter of
              law because Pyramid has failed to come forward with any
              evidence of damage..............................................................16

        3.     Pyramid's Building Restoration claim fails as a matter of
              law because Pyramid has failed to come forward with any
              evidence of damage and Hartford has paid all
              substantiated amounts ..........................................................18

    B.     Hartford Is Entitled to Summary Judgment on Pyramid's Breach
           of Covenant of Good Faith and Fair Dealing Claim..........................19

         1.     Pyramid's bad faith claim fails because Pyramid cannot
              prevail on its breach of contract claim....................................20

        2.     Alternatively, Pyramid's bad faith claim fails based on the
              "genuine dispute" rule..........................................................21

**TABLE OF CONTENTS**
**(continued)**

**Page**

      a.    Hartford relied on two experts in making its coverage decision regarding Pyramid's Inventory Loss claim ................................................................. 22

      b.    Pyramid never substantiated its Business Interruption claim ............................................. 22

      c.    Hartford paid in good faith all Building Restoration costs substantiated by Pyramid ...................................... 23

V.    CONCLUSION ........................................................................... 24

**MEMORANDUM OF POINTS AND AUTHORITIES ISO HARTFORD'S MOTION FOR SUMMARY JUDGMENT**

la-1115474

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*1231 Euclid Homeowners Ass'n. v. State Farm Fire & Cas. Co.,*
   135 Cal. App. 4th 1008 (2006) ....................................................................17, 18

*Abdelhamid v. Fire Ins. Exch.,*
   182 Cal. App. 4th 990 (2010) .............................................................................11

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986).............................................................................................10

*Benavides v. State Farm Gen. Ins. Co.,*
   136 Cal. App. 4th 1241 (2006) ...........................................................................20

*Buxbaum v. Aetna Life & Cas. Co.,*
   103 Cal. App. 4th 434 (2002) .............................................................................16

*Cal. Shoppers, Inc. v. Royal Globe Ins. Co.,*
   175 Cal. App. 3d 1 (1985) ..................................................................................22

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986).............................................................................................10

*Fraley v. Allstate Ins. Co.,*
   81 Cal. App. 4th 1282 (2000) ..............................................................21, 22, 23

*Guebara v. Allstate Ins. Co.,*
   237 F.3d 987 (9th Cir. 2001) ..............................................................................21

*Love v. Fire Ins. Exch.,*
   221 Cal. App. 3d 1136 (1990) .....................................................................19, 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986).......................................................................................10, 11

*Meridian Textiles, Inc. v. Indemnity Ins. Co. of N. Am.,*
   No. CV 06-4766 CAS, 2008 U.S. Dist. LEXIS 91371
   (C. D. Cal. Mar. 20, 2008) ......................................................................13, 14, 15

*Paulfrey v. Blue Chip Stamps,*
   150 Cal. App. 3d 187 (1983) .......................................................................22, 23

iii

*Reichert v. General Ins. Co.*,
    68 Cal. 2d 822 (1968) ...............................................................................11

*San Diego Housing Comm'n v. Indus. Indem. Co.*,
    68 Cal. App. 4th 526 (1998) ..................................................................20

*Saroyan Lumber Co. v. El & El Wood Prods. Corp.*,
    126 Fed. Appx. 371 (9th Cir. 2005).......................................................17

*St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*,
    101 Cal. App. 4th 1038 (2002) .......................................................11, 19

*Summers v. A. Teichert & Son*,
    127 F.3d 1150 (9th Cir. 1997) ...............................................................11

**STATUTES**

Cal. Civ. Code § 3294(a) ............................................................................19

**OTHER AUTHORITIES**

7 James Wm. Moore, Moore's Federal Practice § 36.03[2]
    (Matthew Bender 3d ed.) ......................................................................17

Fed. R. Civ. P. 36(a) and (b)......................................................................17

Fed. R. Civ. P. 56(a) ..................................................................................10

la-1115474

## I.    INTRODUCTION

In this insurance coverage dispute, Plaintiff Pyramid Technologies, Inc. ("Pyramid"), a reseller of out-of-date electronic parts, seeks coverage for claims made under a business insurance policy issued by Defendant Hartford Casualty Insurance Company ("Hartford").  Pyramid's purported claims for property damage and business interruption arise out of an August 2005 flood of water that allegedly was one to two inches deep (the "water intrusion").  None of this water touched any of Pyramid's inventory, which was shelved approximately five inches above the warehouse floor in moisture-proof packaging.

Pyramid claims that, as a result of the water intrusion, it had trouble selling its practically obsolete inventory (allegedly damaged by increased humidity levels in the warehouse), its business operations were interrupted for approximately 9 days, and its warehouse was damaged, largely in the form of stained carpeting and a telephone system that apparently malfunctioned for the first time nearly a year after the water intrusion.

Hartford has paid Pyramid over $125,000 under the Policy for

- costs associated with cleanup and repair of the warehouse,
- expert inspections of the warehouse and inventory at the time of the water intrusion,
- expert testing of items cherry picked by Pyramid that believed evidenced corrosion purportedly caused by the water intrusion, and
- reimbursement for Pyramid's efforts in gathering information to substantiate its claims.

Pyramid claims that Hartford owes it more, including an expenditure of over $13,000,000 to test its entire inventory[1] — not a representative sample of its

---

[1] It is worth noting that at the time of the water intrusion, Pyramid took no effort to maintain its inventory in a climate-controlled setting (Fact 15) and failed to

(Footnote continues on following page.)

MEMORANDUM OF POINTS AND AUTHORITIES ISO HARTFORD'S MOTION FOR SUMMARY JUDGMENT
la-1115474

1  choosing — which it reported to the Internal Revenue Service in 2005 was worth
2  between $600,000 and $2,000,000.[2]  Despite its claims that such testing is
3  absolutely necessary to ensure that its parts are not damaged, Pyramid has managed
4  to sell approximately 17,000,000 of the parts in inventory at the time of the water
5  intrusion, without evidence of a single item being returned due to damage caused
6  by the water intrusion.

7        More than five and a half years have passed and Pyramid has been unable to
8  come forward with any evidence of damages that Hartford has failed to
9  compensate.  Nonetheless, Pyramid persists with its claims against Hartford, giving
10 new meaning to the term "Pyramid scheme."  Simply put, Pyramid has no
11 uncompensated loss in this case, and, as a result, it cannot prove damage (due in no
12 small part to its failure to preserve the allegedly damaged property).  Without
13 damage — an essential element of its claim for breach of contract — there is no
14 coverage, no breach of contract, and no breach of the covenant of good faith and
15 fair dealing.  As a matter of law, Pyramid's claims fail and Hartford is entitled to
16 summary judgment.

17 **II.    UNCONTROVERTED FACTS**

18       **A.    The Parties, Insurance Policy, and Background to the Case.**

19       Pyramid is a reseller of out-of-date electronic parts.  (Uncontroverted Fact
20 ("Fact") 1.)  Hartford is a commercial property insurance carrier that issued
21 Pyramid Spectrum Business Insurance Policy Number 72 SBQ AF7591, effective

22 _____

(Footnote continued from previous page)

23
24 follow manufacturer recommendations with respect to maintenance of moisture-
   sensitive items.  (Facts 16-19.)  Moreover, Pyramid was completely ignorant of the
25 condition of the items at the time Pyramid purchased them.  (Fact 20.)

26       [2] Deposition of Brad Pomeroy ("Pomeroy Depo.") 66:2-6 and Exhibit 41,
   attached to the Declaration of Purvi G. Patel ("Patel Decl.") Exhibits H and J.

27
28

1   February 12, 2005 to February 12, 2006 (the "Policy").  (Facts 2-3.)  The Policy
2   provides coverage of $5.5 million for business personal property replacement cost,
3   $1 million for building replacement cost, and $3 million for gross earnings lost due
4   to business interruption.  (Fact 4.)
5       On January 9, 2008, Pyramid filed the operative complaint against Hartford,
6   alleging two causes of action: (1) breach of contract and (2) breach of the implied
7   covenant of good faith and fair dealing.  [Doc. Nos. 1-2 to 1-3.]  Hartford removed
8   the case to this Court on April 4, 2008.  [Doc. No. 1-2.]

9   **B.   No Water From the August 2005 Water Intrusion Came Into Contact With Any Inventory at Issue and Hartford's Expert Concluded That There Was No Damage to Pyramid's Inventory.**

11      On the morning of August 11, 2005, a Pyramid employee discovered the
12  water intrusion, which was observed to be anywhere from one to two inches deep.
13  (Facts 22-23.)  None of this water touched any of the inventory that is at issue in
14  this dispute because nearly all of Pyramid's inventory was stored on shelving that
15  was approximately five inches above the warehouse floor.  (Facts 24-25.)[3]  All of
16  the "moisture-sensitive" items in Pyramid's inventory were either packaged in their
17  original moisture-proof packaging or were repackaged in vacuum-sealed moisture-
18  proof packaging.  (Facts 13-14.)  Following the water intrusion, some condensation
19  was observed on the exterior of the moisture-proof packaging.  (Fact 27.)
20      Clean up at the warehouse began on the same day Pyramid discovered the
21  water intrusion.  ServPro Industries, Inc. ("ServPro"), a building cleanup service
22  (paid for by Hartford),[4] removed most of the water from the warehouse on the first

24   [3] If any boxes on the floor were exposed to water, Pyramid has not shown that the items inside were damaged.  (Fact 26.)

26   [4] Hartford paid the full amount for ServPro's services, which amounted to $6,688.16.  (Declaration of Houston Hemp ¶ 13.)

1    day, August 11, 2005, and continued to work onsite until August 16, 2005.  (Fact

2    28.)  ServPro set up fans and humidity control devices that remained onsite

3    throughout the entire period ServPro worked.  (Fact 29.)  Starting on August 12,

4    2005, ServPro measured the temperature and relative humidity inside the

5    warehouse daily.  (Fact 30.)  From August 12 to August 16, the relative humidity

6    inside the warehouse ranged from 24.9 percent to 61.6 percent.[5]  (Fact 31.)

7    **C.    Pyramid Did Not Test the "Moisture-Sensitive" Items in Its
         Inventory and Failed to Follow Manufacturer Standards for Such
8         Items.**

9          Even though Pyramid had no knowledge of the condition of the moisture-

10   sensitive items at the time it purchased them, Pyramid did not test the items, either

11   prior to purchasing them or once they were in inventory (unless requested by a

12   purchaser as a condition of sale).  (Facts 20-21.)  In fact, Pyramid itself stored the

13   moisture-sensitive items in its inventory in a warehouse that was not climate-

14   controlled — it had no air conditioning or any humidity control equipment in place

15   as of August 2005.  (Fact 15.)

16         Moreover, even though certain items contained manufacturer

17   recommendations for when the items needed to be re-baked (a process used to

18   ensure that no moisture is on or in an item), Pyramid did not employ any

19   procedures to track when re-baking was recommended.  (Fact 18.)  As a result,

20

21   _____

22         [5] Prior to the water intrusion forming the bases of Pyramid's claims in this
     case, the Pyramid warehouse previously suffered a flood in October 2004, causing
23   relative humidity levels in the warehouse to rise to "over 80 percent."  (Mavusi
     Depo. 24:5-28:9, attached as Ex. M to Patel Decl., Pomeroy Depo. Ex. 40 at 05368-
24   69, attached as Ex. H to Patel Decl.; Pyramid's Response to Third Set of Requests
     for Admission 44-54, attached as Ex. W to Patel Decl..)  Despite this, Pyramid was
25   not concerned of any damage to its inventory and made no claims of damage to its
     inventory from that water intrusion.  (Pyramid's Response to Third Set of Requests
26   for Admission 52, attached as Ex. V to Patel Decl.)

27

28

sometimes Pyramid sold items that were past the recommended bake date.  (Fact 19.)

### D. Pyramid's Claims for Inventory Total Loss, Business Interruption, and Building Restoration.

On or about January 12, 2006, Hartford received Pyramid's "Proof of Claim Documentation and Supplemental Payment Demand" ("January 2006 Proof of Claim") containing claims for Inventory Total Loss (which included an amount for testing *every* item in Pyramid's inventory at the time of the water intrusion), Business Interruption, and Building Restoration.  (Facts 32-33.)  Hartford responded to the January 2006 Proof of Claim as follows:

- **Inventory Total Loss claim:**  Hartford advised Pyramid that it was rejecting the proof of loss because it failed to meet the requirements for a proof of loss because Pyramid did not provide documentation evidencing a total loss of inventory.  Likewise, for the $13,274,110 requested for inventory testing, Hartford advised Pyramid that it was rejecting the proof of loss in part because no supporting documentation had been provided.  (Fact 34-35.)

- **Business Interruption claim:**  Hartford advised Pyramid that it was rejecting the proof of loss for the same reasons it was rejecting the proof of loss for the Inventory Total Loss claim.  (Fact 36.)

- **Building Restoration claim:**  Hartford accepted the proof of loss as meeting the requirements for a proof of loss, but took exception to the amount and scope of repairs that comprised the $117,437.85 claim.  (Fact 37.)

Each of these claims is described more fully below.

### 1. Pyramid made an Inventory Loss claim without evidence of any damage to its inventory.

On August 18 and 19, 2005, Belfor USA Group ("Belfor"), an independent expert retained by Hartford, inspected the warehouse, inventory, and temperature

5

1  and humidity data recorded by ServPro.  (Fact 38.)  Following its investigation,

2  Belfor concluded: "In the professional opinion of BELFOR USA based on initial

3  and subsequent humidity level readings, no damage occurred to the components in

4  question according to [an attached Joint Industry Standard]."  (Fact 39.)  Pyramid

5  included with the January 2006 Proof of Claim, information criticizing Belfor's

6  conclusions.  (Fact 40.)  After reviewing the criticism, Belfor did not change its

7  conclusions.  (Fact 41.)

8        On June 14, 2007, Pyramid claimed that three returns "could have been

9  caused or contributed to by moisture/humidity."  (Fact 42.)  Pyramid refunded its

10  customers less than $260 for these three returns.  (Fact 43.)  In deposition,

11  Pyramid's Quality Assurance Manager admitted that 2 of the returns did not

12  involve "moisture-sensitive" devices.  (Fact 44.)

13        For the third "relevant" return, taking place in May 2007, Pyramid claimed

14  that 19 pieces were returned to Pyramid by a customer ("May 2007 Returns").

15  (Fact 46.)  Based on its review of pictures of the May 2007 Returns, Pyramid

16  asserted that there appeared to be some "foreign residue" on the returned items.

17  (Fact 47.)  Once again, at deposition, Pyramid's Quality Assurance Manager

18  conceded the lack of merit of Pyramid's inventory loss claim by testifying that the

19  foreign residue on the May 2007 Returns "could be due to grease, solder residues,

20  flux residue, any number of things.  It could be -- Especially with excess inventory,

21  you don't know where it's been."  (Fact 48.)

22        Contrary to its clear duty under the Policy, Pyramid did not preserve any of

23  these returned items, thereby depriving Hartford the opportunity to inspect them.

24  (Fact 49.)  In fact, Pyramid discarded the returned parts *before* notifying Hartford of

25  the returns.  (Fact 50.)  Despite the fact that Pyramid had not abided by the claims

26  procedures required under the Policy, Hartford arranged to have a selection of

27  Pyramid's inventory tested by an independent laboratory in August 2007.  (Fact

28  51.)

On August 8, 2007, Dr. Arun Kumar of SEAL Laboratories ("SEAL") did a physical inspection of the Pyramid warehouse and random inspection of the inventory of electronic components on the shelves in the Pyramid warehouse.  (Fact 52.)  As part of this inspection, Dr. Kumar examined numerous samples of items that Pyramid employees had segregated based on their belief that the items either showed signs of corrosion or showed no corrosion.  (Fact 53.)  Dr. Kumar's inspection found that the selected segregated affected items revealed no corrosion.  (Fact 54.)

On August 10, 2007, Dr. Kumar received 374 items for analysis, once again hand selected by Pyramid as allegedly evidencing signs of corrosion, tarnish, or discoloration.  (Fact 55.)  During Phase I non-destructive testing, Dr. Kumar examined 374 items under a 10-20X magnification microscope.  (Fact 56.)  Of these 374 items, 227 displayed no signs of corrosion, tarnish, or discoloration.  (Fact 57.)  The remaining 147 items, which revealed signs of either corrosion, discoloration, or some type of whitish deposit between the leads, were referred to Phase II of the testing.  (Fact 58.)

In Phase II, as in Phase I, Dr. Kumar utilized military standards.  (Fact 62.)  The military standards utilized to evaluate the discoloration (caused by corrosion) clearly state that "Discoloration is not sufficient cause for rejection."  (Fact 61.)  For Phase II analysis, parts showing discoloration in Phase I were randomly selected and photographed to capture overall condition of the part, the part markings, and the worst condition of the leads in relation to corrosion, oxidation, tarnishing, and discoloration.  (Fact 63.)  Detailed optical microscopy was also performed on the leads of all the parts and the worst case discoloration on the leads was photographed at 20X magnification.  (Fact 64.)  Phase II also included scanning electron microscopy (SEM) with an energy dispersive X ray (EDX) microprobe analysis to determine the chemical composition of the surface discoloration, tarnish, and corrosion product (when present).  (Fact 65.)  Finally,

Phase II testing included solderability testing using a Joint Industry Standard IPC/ECA J-STD-002C specification, which determines whether parts can be soldered into circuits on printed wiring boards, and Residual Gas Analysis (RGA) testing, which checks for moisture ingress in the parts that contain an internal cavity.  (Fact 66.)  Solderability is the ultimate test for acceptability of these components for these observations.  (Fact 60.)

Only two items out of the 147 Phase II-tested items were found to be unsuitable for commercial applications: one item failed the solderability and RGA test and the other item failed the RGA test only.  (Fact 67.)  Both of these items were between 13 and 30 years old.  (Fact 67.)  At the completion of Phase II testing, Dr. Kumar concluded that the water intrusion did not cause any damage to the parts examined from Pyramid's inventory.  (Fact 68.)

Following the testing conducted by SEAL, in March 2009, Pyramid claimed that a fourth customer return (commanding a refund of $100) provided evidence of damage caused by the water intrusion (the "March 2009 Returns").  (Facts 69-70.)  The March 2009 Returns comprised 50 items manufactured in 1998 that were returned to Pyramid because of "oxidized leads."  (Fact 69.)  Once again, Pyramid's Quality Assurance Manager admitted in deposition that oxidation on older parts could be attributable to the passage of time — 11 years for the March 2009 Returns — because "[t]ime is also a robber of metals."  (Fact 45.)

> **2.  Pyramid made a Business Interruption claim without evidence of any loss of business caused by the water intrusion.**

On August 19, 2005, Hartford requested the following documentation from Pyramid to assess the merits of Pyramid's business interruption claim:

> monthly sales, by sales category (stock vs non-stock), for
> August 2002 through the present (orders shipped and business
> booked); Daily sales, by sales category (stock vs. non-stock), for
> May 2005 through the present (orders shipped and business

8

booked); monthly income statements, including detail to all
expenses, for August 2004 through the present; copies of any
cancelled contracts or delayed contracts due to the loss;
inventory levels, by sales category for August 2004 through the
present.

(Fact 74.)  From August 19, 2005 until March 14, 2006, Hartford reiterated its
request for supporting documentation from Pyramid substantiating its business
interruption claim at least five times.  (Fact 75.)  On March 14, 2006, Pyramid
informed Hartford in writing that it was withdrawing its business interruption
claim.   (Fact 76.)

Pyramid did not pursue a business interruption claim again until December
29, 2006, when it made a new business interruption claim for past and future
interruption.  (Fact 77.)  By June 2007, Pyramid changed its position with respect to
the business interruption claim yet again, and elected to pursue only past
interruption from August 11, 2005 to August 19, 2005.  (Fact 78.)  Pyramid has
persisted with this claim despite admitting that the water intrusion did not result in
any cancelled or delayed contracts with any actual or prospective buyers.  (Facts
79-80.)

### 3.   Following Hartford's full payment of Pyramid's substantiated Building Restoration claim, Pyramid made two unsubstantiated claims that Hartford denied.

Consistent with Belfor's August 19, 2005 estimate of $6640.34 for the cost
of repairs for building damage resulting from the water intrusion, on September 7,
2005, Hartford issued a check to Pyramid for $5,640.34 (Belfor's estimate less
Pyramid's $1,000 deductible).  (Facts  83-84.)  In addition, on September 11, 2006,
Hartford issued a second check to Pyramid for $88,480 for additional building
repairs.  (Fact 85.)

In December 2006, Pyramid informed Hartford of two additional building
damage claims.  First, Pyramid informed Hartford that it would incur $83,652.76 in

9

1  expenses while clearing all of the contents in its warehouse to seal the warehouse
2  floor (the "pack out/pack in" claim).  (Facts 86-87.)  Hartford informed Pyramid
3  that it would pay for the pack-out and pack-in expenses once Pyramid incurred
4  them and instructed Pyramid to submit an invoice to Hartford for payment.  (Fact
5  88.)  Pyramid has never sent Hartford an invoice for this expense.  (Fact 89.)

6  Second, Pyramid disclosed to Hartford for the first time that its telephone
7  system had failed due to the August 2005 water intrusion.  (Fact 90.)  Contrary to
8  the claims procedures required under the Policy, Pyramid allowed the telephone
9  vendor to take the telephone system before Hartford could inspect it.  (Fact 92.)
10  Documentation submitted by Pyramid showed that Pyramid first made a repair call
11  for the telephone system in June 2006 — nearly one year after the August 2005
12  water intrusion.  (Fact 94.)  Hartford denied the claim because there was no
13  evidence (and no way to obtain any evidence) that the phone system failed as a
14  result of the water intrusion.  (Fact 93.)

### III.   LEGAL STANDARD

16  Under Rule 56 of the Federal Rules of Civil Procedure, "the Court shall grant
17  summary judgment if the movant shows that there is no genuine dispute as to any
18  material fact and the movant is entitled to judgment as a matter of law."
19  Fed. R. Civ. P. 56(a).  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255
20  (1986) (all justifiable inferences to be drawn in non-movant's favor).  The moving
21  party is entitled to summary judgment if it demonstrates the absence of an essential
22  element of the opponent's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)
23  ("[T]he burden on the moving party may be discharged by 'showing' — that is,
24  pointing out to the district court — that there is an absence of evidence to support
25  the nonmoving party's case.").

26  Once the moving party has met its initial burden, the burden shifts to the non-
27  moving party and the non-moving party "must come forward with specific facts
28  showing that there is some genuine issue for trial."  *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The non-moving party must do more than simply show that there is some "metaphysical doubt" as to the material facts.  *Id.* at 586.  The "nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'  Summary judgment may be granted if 'the evidence is merely colorable . . . or is not significantly probative.'" *Summers v. A. Teichert & Son*, 127 F.3d 1150, 1152 (9th Cir. 1997) (citations omitted).  There is no genuine issue of material fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion.  *Matsushita*, 475 U.S. at 587.

## IV.   ARGUMENT

### A.   Hartford Is Entitled to Summary Judgment on Pyramid's Breach of Contract Claim.

"The standard elements of a claim for breach of contract are (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom." *Abdelhamid v. Fire Ins. Exch.*, 182 Cal. App. 4th 990, 999 (2010) (affirming summary judgment in favor of insured because not all elements for breach of contract were met) (citation and quotations omitted). Plaintiff's damages as a result of the breach are an essential element of a breach of contract action.  *Reichert v. General Ins. Co.*, 68 Cal. 2d 822, 830 (1968); *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1060 (2002).

Pyramid claims that it is entitled to payment for the following three types of claims: (1) inventory loss; (2) business interruption; and (3) building restoration. As demonstrated below, Pyramid cannot establish that it incurred any uncompensated damage covered by the Policy for any of these three claims, and therefore Pyramid cannot prevail on its breach of contract claim.

**1.    Pyramid's Inventory Loss claim fails as a matter of law because Pyramid cannot show any damage to its inventory resulting from the water intrusion.**

After more than five years, Pyramid cannot establish that a single item in the approximately 52,000,000-piece inventory present in the warehouse at the time of the water intrusion (Fact 12) was damaged by water.  It is undisputed that:

♦    None of the inventory — stored on shelving five inches from the floor — came into direct contact with the "intruding" water, which rose to a level of one-to-two inches maximum.  (Facts 23-24.)

♦    Nearly all of the inventory was encased in moisture-proof packaging, and there is no indication that the packaging was compromised, either at the time of the water intrusion or based on Pyramid's historical experience.  (Facts 13-14.)

♦    Pyramid sold approximately 17,000,000 items from the inventory present at the time of the water intrusion (Fact 71), without doing any testing of its own to determine whether the items had sustained any damage, despite claiming that increased humidity levels following the water intrusion damaged the items such that they became unsaleable. (Fact 26.)

Indeed, two experts retained by Hartford, Belfor and SEAL, to assess Pyramid's inventory loss claim have found through inspections or testing that not a single piece of inventory suffered any water damage.  Specifically, after Belfor examined the warehouse and inventory in the days following the water intrusion as well as considered the humidity level readings taken by ServPro, Belfor concluded that "no damage occurred to the components" in the warehouse at the time of the water intrusion.  (Fact 39.)  Subsequent to Belfor's investigation, Hartford retained Dr. Kumar of SEAL to inspect and test samples of items that were selected by Pyramid based on Pyramid's belief that the items showed evidence of tarnish.  (Fact

55.)  Following a two-phase examination involving 374 of these cherry-picked samples, Dr. Kumar determined that:

- ♦ 227 of 374 items passed Phase I testing because they showed no sign of corrosion, tarnish, or discoloration upon examination under a 10-20X microscope;

- ♦ 147 of 374 items were referred to Phase II testing, which comprised military-grade testing, including solderability testing;

- ♦ 2 of 147 items were found to be unsuitable for commercial applications, but these items were between 13 and 30 years old and oxidation was likely due to the passage of time.

(Facts 57-58; 67.)  Even Pyramid has acknowledged that the presence of oxidation can be attributable to the age of an item because "[t]ime is . . . a robber of metals." (Fact. 45.)

This lack of damage due to the water intrusion is consistent with Pyramid's historical business practices.  Pyramid did not store any of the inventory at issue in a climate-controlled warehouse that protected against heat or humidity and failed to follow industry or manufacturer standards for "baking" the items.[6]  (Facts 15; 18.) In addition, Pyramid never conducted any testing of the items at the time it purchased them, despite having no knowledge of the condition of the items at the time of purchase.  (Fact 20.)  Nevertheless, Pyramid claims that Hartford should have paid over $13,000,000 to test each and every item in its inventory at the warehouse on the date of the water intrusion.[7]  This claim is made without any

_____

[6] "Baking" is a process used to ensure that there is no moisture on an item. (Fact 17.)

[7] Pyramid asserts that coverage for this testing is provided under the Policy's "extra expense" provision.  That provision provides: "We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred *if there had been no direct physical loss or damage to property* at the

(Footnote continues on following page.)

1   evidence suggesting that such testing is warranted, either based on the

2   circumstances surrounding the water intrusion itself or any subsequent

3   developments regarding the functionality of the items.

4          To obfuscate the plain lack of damage, Pyramid points to returns, but these

5   claims have no merit either.  For those items that were subsequently returned

6   because they were defective, there is no evidence that the defects were caused by

7   the water intrusion.  There is, in fact, considerable evidence foreclosing that the

8   defects were due to the water intrusion.  In fact, Pyramid admits only three returns

9   *may* involve items damaged due to moisture or humidity.  (Fact 42.)  None of these

10  three returns — for which Pyramid refunded purchasers a grand total of $260 —

11  suffered from any defect attributable to the water intrusion.  (Fact 43.)  Moreover,

12  Pyramid admits that two of the three returns did not even involve "moisture-

13  sensitive" items.  (Fact 44.)  For the third return, which involved items Pyramid

14  claims contain a "foreign residue," Pyramid's Quality Assurance Manager himself

15  concedes that the foreign residue "could be due to grease, solder residues, flux

16  residue, any number of things.  It could be -- Especially with excess inventory, you

17  don't know where it's been."  (Fact 48.)  Not surprisingly, Pyramid did not save

18

19  _____

20  (Footnote continued from previous page)

21  "scheduled premises", . . . , caused by or resulting from a Covered Cause of Loss."
22  (Fact 7) (emphasis added).  The unambiguous language of the provision indicates,
    however, that it only applies where the insured experienced a "direct physical loss
23  or damage to property." (Fact 9.)  *See Meridian Textiles, Inc. v. Indemnity Ins. Co.
    of N. Am.*, No. CV 06-4766 CAS, 2008 U.S. Dist. LEXIS 91371, at *7 (C. D. Cal.
24  Mar. 20, 2008) ("While insurance contracts have special features, they are still
    contracts to which the ordinary rules of contractual interpretation apply.")  Here,
25  Pyramid has no evidence of "direct physical loss" to its inventory, which under
    California law, requires a "district, demonstrable, physical alteration."  *Id*. at *10-
26  11.

27

28

**Memorandum Of Points And Authorities ISO Hartford's Motion For Summary Judgment**
la-1115474

1    any of the returned products, thereby depriving Hartford of the ability to test them.

2    (Fact 49.)

3          Unable to specifically point to any actual damage, Pyramid now claims that

4    that its inventory was damaged because it was unable to sell it because it was

5    "stigmatized" by the water intrusion.  This argument is belied by the facts, which

6    show that as of May 2010, Pyramid had sold approximately 17,000,000 parts that

7    were in inventory at the time of the water intrusion.  (*See* Fact 71.)

8          More importantly, California law on this issue is unavailing:  "Damage" by

9    stigma or to reputation does not constitute a loss covered by the Policy, which only

10   provides coverage for "direct *physical* loss of or damage to Covered Property."

11   (*See* Fact 5) (emphasis added).  Interpreting the meaning of "physical" in a similar

12   insurance coverage provision, and applying California law, this Court has held that

13   "[t]he word 'physical' in the policy provision 'loss or damage' modifies both 'loss'

14   and 'damage.'"  *Meridian Textiles, Inc.*, 2008 U.S. Dist. LEXIS 91371, at *9 (citing

15   *Ward Gen. Ins. Servs., Inc. v. Employers Fire Ins. Co.*, 114 Cal. App. 4th 548, 554

16   (2003)).  In recognizing that "physical damage is a condition precedent to

17   coverage," the court stated:

18          [T]he requirement that the loss be "physical," given the ordinary

19          definition of that term is widely held to exclude alleged losses

20          that are intangible and incorporeal, and, thereby, to preclude any

21          claim against the property insurer when the insured merely

22          suffers a detrimental impact unaccompanied by a distinct,

23          demonstrable, physical alteration of the property.

24   *Id.* at *10-11 (quoting 10A Couch on Ins. § 148.46 (3d ed. 2005)).

25          The same reasoning applies here.  Any perceived "[d]iminution of value" of

26   Pyramid's inventory does not constitute "physical damage" to "tangible property"

27   under California law.  *Id.* at *11 (citing *New Hampshire Ins. Co. v. Vieira*, 930 F.2d

28   696, 700 (9th Cir. 1991)) (internal quotation marks omitted).  Without evidence of

15

1   physical damage caused by the water intrusion, there is no coverage under the
2   Policy for this claim, and the undisputed facts lead to only one conclusion —
3   Hartford is entitled to summary judgment on this issue.

   **2.     Pyramid's Business Interruption claim fails as a matter of law because Pyramid has failed to come forward with any evidence of damage.**

6   Pyramid's claim for lost business income from August 11, 2005 to August
7   19, 2005 fails for three reasons: (1) Pyramid has never claimed that it suffered a
8   complete cessation of business operations during this time, as is plainly required
9   under the Policy and California law; (2) Pyramid has already admitted through
10  requests for admission that it lost no business due to the water intrusion; and
11  (3) Pyramid has failed to provide any documentation supporting the claim.

12  First, to recover lost business income under the Policy, the loss of income
13  must be caused by the "necessary suspension of [the insured's] operations during
14  the "period of restoration."[8]  (Fact 8.)  Necessary suspension, under California law,
15  requires a *complete cessation* of business operations.  *See Buxbaum v. Aetna Life &*
16  *Cas. Co.*, 103 Cal. App. 4th 434, 444 (2002) (holding that the clear language of
17  "necessary suspension" can only mean a complete cessation of business
18  operations).  In this case, Pyramid has never claimed that it was forced to
19  completely shut down its business operations from August 11, 2005 to August 19,
20  2005.  In fact, the evidence is to the contrary:  Pyramid claims in conclusory
21  fashion that during August 11, 2005 to August 16, 2005, "there was interruption
22  with the normal business activities due to the noise of the [emergency] equipment";

---

[8] Moreover, the "suspension must be caused by direct physical loss of or damage to property . . . ."  (Fact 9.)  To the extent Pyramid's business interruption claim is premised on its loss of inventory claim, as has been discussed extensively, Pyramid cannot show any direct physical loss thereby precluding coverage under the "business income" provision of the Policy.

1   that "[t]here was an interruption with the ability of the sales force to complete

2   business as usual in their normal setting" resulting in "a negative impact on the

3   business'" and that "the disruption of the typical day-to-day business environment .

4   . . was suffered for the balance of the work week ending on August 19, 2005."

5   (Facts 72-73.)  Under California law, such "interruption" is insufficient to

6   constitute "necessary suspension."  *Buxbaum,* 103 Cal. App. 4th at 448 ("[A] lack

7   of normal business activities and a disruption caused by the water damage do not

8   constitute a total cessation of the firm's business activities.") (citations and

9   quotations omitted).

10          Second, the undisputed facts, admitted by Pyramid during discovery,

11   conclusively establish that Pyramid has had no contracts with actual or prospective

12   buyers cancelled or delayed as a result of the water intrusion.  (Facts 79-80.)  Once

13   admitted, this fact is established conclusively for the purposes of the lawsuit.  Fed.

14   R. Civ. P. 36(a) and (b); *see* 7 James Wm. Moore, Moore's Federal Practice

15   § 36.03[2] (Matthew Bender 3d ed.); *Saroyan Lumber Co. v. El & El Wood Prods.*

16   *Corp.*, 126 Fed. Appx. 371, 373 (9th Cir. 2005) (affirming entry of summary

17   judgment based on facts deemed admitted).

18          Finally, despite numerous requests from Hartford for evidence substantiating

19   its business interruption claim, Pyramid never provided any substantiation of its

20   claim that its business operations were interrupted between August 11, 2005 and

21   August 19, 2005.  (Fact 75.)  Indeed, in March 2006, Pyramid withdrew its business

22   interruption claim rather than provide documentation to substantiate it.  (Fact 76.)

23   Then, nine months later, Pyramid made a new business interruption claim — this

24   time for past and future interruption.  (Fact 77.)  Pyramid still failed to substantiate.

25   By June 2007, Pyramid changed its position yet again, and elected to pursue only

26   past interruption from August 11, 2005 to August 19, 2005.  (Fact 78.)  To date,

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES ISO HARTFORD'S MOTION FOR SUMMARY JUDGMENT**
la-1115474

Pyramid has not substantiated any interruption of its business operations as a result of the water intrusion.[9] *See 1231 Euclid Homeowners Ass'n. v. State Farm Fire & Cas. Co.*, 135 Cal. App. 4th 1008, 1018 (2006) ("The burden is on the insured to initiate and support a claim.").

> **3.    Pyramid's Building Restoration claim fails as a matter of law because Pyramid has failed to come forward with any evidence of damage and Hartford has paid all substantiated amounts.**

As an initial matter, Hartford has paid Pyramid all substantiated amounts relating to damage to its warehouse:

- ♦    $6,640.34 for building repairs, as estimated in Belfor's August 19, 2005 estimate (less Pyramid's $1,000 deductible); and

- ♦    $88,480 for carpet replacement and other building repairs, as negotiated with Pyramid's public adjuster.

Pyramid claims that Hartford has failed to pay $12,074 for replacement of its telephone system and $83,652.76 for its "pack out/pack in" claim. (Facts 87; 91.) There is no evidence, however, that with respect to the "telephone system" claim damage was caused by the water intrusion and with respect to the "pack out/pack in" claim that the costs have been incurred. (Facts 89; 93.)

Hartford first learned of the telephone system claim in December 2006, well over a year after the August 2005 water intrusion. (Fact 90.) Tellingly, the first repair call to the system was made in June 2006, almost a year after the August 2005 water intrusion. (Fact 94.) Pyramid also failed to retain the system, preventing Hartford from inspecting it or conducting any tests to ascertain the

---

[9] To the extent Pyramid claims that it can substantiate its business interruption claim by showing that it was unable to sell its inventory because it was "stigmatized" by the water intrusion, its argument fails for the same reasons as discussed above.

reason it malfunctioned.  (Fact 92.)  Pyramid's failure timely to notify Hartford of the alleged damage to the telephone system and to save the system for Hartford to inspect is directly contrary to the duties imposed on Pyramid under the Policy[10] and is a complete defense to Pyramid's breach of contract claim.  *See 1231 Euclid Homeowners Ass'n.*, 135 Cal. App. 4th at 1018, 1021 ("the total failure to comply with the notice and proof of loss conditions will excuse insurer liability due to the failure of a condition precedent").

With respect to its "pack out/pack in" costs, Hartford informed Pyramid that it would reimburse Pyramid for these expenses once they were incurred.  (Fact 88.)  Pyramid has not submitted a claim to Hartford.  (Fact 89.)  Because Pyramid never submitted an invoice to Hartford documenting the expenses and requesting reimbursement, its claim is meritless.

### B.  Hartford Is Entitled to Summary Judgment on Pyramid's Breach of Covenant of Good Faith and Fair Dealing Claim.[11]

Under California law there are two requirements to establish a breach of the implied covenant of good faith and fair dealing (the "bad faith claim") in the context of an insurance policy:  (1) benefits due under an insurance policy have

---

[10] The Policy requires, *inter alia*, Pyramid to give Hartford "prompt notice" of the loss of damage, set aside the damaged property for examination, and permit Hartford to "inspect the property."  (Fact 11.)

[11] As a part of its bad faith claim, Pyramid seeks punitive damages.  As an initial matter, Pyramid's punitive damages claim should summarily be dismissed because Pyramid cannot prevail on the bad faith claim.  It should also be dismissed because even if Pyramid's allegations were true, and Hartford had unreasonably handled Pyramid's claims (which, as a matter of law, it has not), those facts alone would not justify an award of punitive damages at trial.  To succeed on a claim for punitive damages, a plaintiff must prove, by "clear and convincing evidence," that the defendant is guilty of "malice," "oppression" or "fraud."  Cal. Civ. Code § 3294(a).

been withheld; and (2) the insurer withheld the benefits unreasonably or without proper cause.  *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 (1990).

Pyramid cannot prevail on its bad faith claim for the same reason it cannot prevail on its breach of contract claim — it has failed to come forward with any evidence of uncompensated damages.  Without the essential element of damages, there is no coverage and there can be no breach of contract.  *St. Paul Fire & Marine Ins. Co.*, 101 Cal. App. 4th at 1060.  That said, assuming, *arguendo*, that there exists a "genuine dispute" as to coverage, Pyramid's bad faith claim fails for the additional reason that Hartford's denial of coverage was reasonable as a matter of law.  Both of these arguments are discussed more fully below.

### 1.   Pyramid's bad faith claim fails because Pyramid cannot prevail on its breach of contract claim.

As a matter of law, Pyramid cannot state a claim for breach of the implied covenant of good faith and fair dealing if it cannot state a claim for breach of contract.  "Where a breach of contract cannot be shown, there is no basis for a finding of breach of the [implied] covenant [of good faith and fair dealing]."  *San Diego Housing Comm'n v. Indus. Indem. Co.*, 68 Cal. App. 4th 526, 544 (1998).  As the Court recognized in *Love*:

> Our conclusion that a bad faith claim cannot be maintained
> unless policy benefits are due is in accord with the policy
> in which the duty of good faith is rooted . . . .  Absent [the
> insured's primary right to receive the benefits of his contract],
> the *auxiliary* implied covenant has nothing upon which to act as
> a supplement, and should not be endowed with an existence
> independent of its contractual underpinnings.

*Love*, 221 Cal. App. 3d at 1153.

The well-reasoned opinion in *Love* established that unless policy benefits are actually due, no cause of action for breach of the implied covenant can be

1   sustained.  Stated another way, if policy benefits are not due, there can be no breach

2   of contract for failing to provide them and thus no bad faith.  *See also Benavides v.*

3   *State Farm Gen. Ins. Co.,* 136 Cal. App. 4th 1241, 1250 (2006) ("an insured cannot

4   maintain a claim for tortious breach of the implied covenant of good faith and fair

5   dealing absent a covered loss.")

6        In this case, as demonstrated above, Pyramid has presented no evidence of

7   damages in support of its breach of contract claim.  As such, because Pyramid

8   cannot state a claim for breach of contract, it also cannot state a claim for breach of

9   the implied covenant of good faith and fair dealing.  Hartford is therefore entitled to

10  judgment as a matter of law on this claim.

11              **2.     Alternatively, Pyramid's bad faith claim fails based on the
                         "genuine dispute" rule.**
12
13       Under California law, a "bad faith claim can be dismissed on summary

14  judgment if the defendant can show that there was a genuine dispute as to

15  coverage."  *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001).

16  Moreover, the "genuine dispute" rule applies where an insurer denies a claim based

17  on the opinions of experts.  *Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1292

18  (2000).

19       Notwithstanding that Pyramid's failure to present evidence of damage dooms

20  its breach of contract and bad faith claims, Pyramid's bad faith claim fails for the

21  additional reason that pursuant to the "genuine dispute" rule, Hartford's denial of

22  the claim was not unreasonable.  *Guebara*, 237 F.3d at 992 ("[A] court can

23  conclude as a matter of law that an insurer's denial of a claim is not unreasonable,

24  so long as there existed a genuine issue as to the insurer's liability.") (quoting

25  *Lunsford v. Amer. Guar. & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994)).  If the

26  Court were to find that Pyramid has presented material evidence of uncompensated

27  damage (which Hartford disputes exists), then the facts present a textbook example

28

of a genuine coverage dispute:  Pyramid and Hartford disagree about the valuation of Pyramid's inventory, business interruption, and building restoration claims.

### a. Hartford relied on two experts in making its coverage decision regarding Pyramid's Inventory Loss claim

To assess Plaintiff's inventory loss claim, Hartford retained an expert — Belfor — to examine the warehouse and inventory.  (Fact 38.)  Hartford also retained a second expert  — Dr. Kumar of SEAL — to conduct military-grade testing on items that Pyramid had self-selected as evidencing signs of corrosion purportedly caused by the water intrusion.  (Facts 51; 55; 62.)  Both Belfor and Dr. Kumar concluded that the water intrusion could not have physically damaged Pyramid's inventory, (Facts 36; 68), particularly in light of the fact that none of the inventory, sealed in moisture-proof packaging, came into contact with the water. (*See* Facts 13; 14; 25.)  Based on these findings by Belfor and Dr. Kumar, Hartford reasonably denied Pyramid's request to expend over $13,000,000 to test each and every item in Pyramid's inventory at the time of the water intrusion.  *Fraley*, 81 Cal. App. 4th at 1293 ("Where the parties rely on expert opinions, even a substantial disparity in estimates for the scope and cost of repairs does not, by itself, suggest the insurer acted in bad faith.")

### b. Pyramid never substantiated its Business Interruption claim

To assess Pyramid's business interruption claim, Hartford requested on several occasions documents substantiating the claim.  (Fact 75.)  No documents, however, were forthcoming.  Moreover, as discussed above, the question of whether (and to what extent) Pyramid was claiming business interruption remained in flux, further casting doubt on the merit of this claim.  (*See* Facts 76-78.) Throughout the lengthy back-and-forth, during which time Pyramid made, withdrew, expanded, and contracted its business interruption claim, Hartford repeatedly attempted to evaluate this claim.  Pyramid never provided Hartford the

means to do so, and its failure to comply with the claims procedures cannot be blamed on Hartford. *Cal. Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal. App. 3d 1, 57 (1985) ("[W]ithout actual presentation of a claim by the insured in compliance with claims procedures contained in the policy, there is no duty imposed on the insurer to investigate the claim."); *Paulfrey v. Blue Chip Stamps*, 150 Cal. App. 3d 187, 199-200 (1983) ("It would seem reasonable that any responsibility to investigate on an insurer's part would not arise unless and until the threshold issue as to whether a claim was filed, or a good faith effort to comply with claims procedure was made, has been determined.")

### c. Hartford paid in good faith all Building Restoration costs substantiated by Pyramid

With respect to Pyramid's building damage claims, Hartford similarly utilized the services of Belfor in assessing the value of the claim. (Fact 38.) Hartford promptly paid the full amount for building repairs consistent with Belfor's estimate. (Fact 84.) In response to additional evidence provided by Pyramid of further damage to its warehouse, Hartford re-inspected the warehouse and made an additional payment following consultation with Pyramid's public adjuster. (Fact 85.) Despite Hartford's subsequent investigation and payment, Pyramid claims that this additional payment evidences bad faith because of the disparity in amounts. But, under California law, "[w]here the parties rely on expert opinions, even a substantial disparity in estimates for the scope and cost of repairs does not, by itself, suggest the insurer acted in bad faith." *Fraley*, 81 Cal. App. 4th at 1291, 1293 (affirming summary judgment where record reveals insurer acted reasonably despite claims from insured that differential between insurer's initial estimate of $115,000 and final arbitration award of $364,500 created triable issue of fact regarding insurer's bad faith in "low balling" initial estimate).

Hartford declined to pay Pyramid's claim for the telephone system and requested an invoice for the "pack out/pack in" claims based on the claims

procedures required under the Policy.  (Facts 88; 93.)  With respect to the telephone system, Hartford learned of the claim more than a year after the water intrusion and after Pyramid had discarded the system.  (Fact 90; 92.)  Pyramid failed to provide the requisite proof of loss, and, as a result, Hartford was under no duty to investigate or pay the claim.  *See Paulfrey*, 150 Cal. App. 3d at 199-200 ("Insurance contracts legitimately call for the filing of a claim, complete with proof of loss. . . . In no event could an insured fail to keep his/her end of the bargain in the first instance, and thereafter seek recovery for breach of a duty to pay seeking punitive damages based on an insurer's failure to investigate a nonclaim.")  With respect to the "pack out/pack in" claim, Hartford represented that it would pay the costs once they were incurred.  (Fact 88.)  Pyramid never submitted an invoice for these costs.  (Fact 89.)  Accordingly, they cannot form the basis for a finding of unreasonableness or bad faith on Hartford's part.

## V. CONCLUSION

For the foregoing reasons, Pyramid has failed to present any evidence of damage and Hartford cannot be held liable for breach of contract or breach of the implied covenant of good faith and fair dealing.  Accordingly, Hartford respectfully requests that the Court grant Hartford's motion for summary judgment in its entirety.

Dated:    March 21, 2011          DAVID F. MCDOWELL
                                  PURVI G. PATEL
                                  MORRISON & FOERSTER LLP


                                  By:   /s/ Purvi G. Patel
                                        Purvi G. Patel

                                  Attorneys for Defendant
                                  HARTFORD CASUALTY
                                  INSURANCE COMPANY